UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YVONNE TROUT, et al.,<br><br>       Plaintiffs,<br><br>       v.<br><br>DONALD C. WINTER,[1] Secretary of the<br>   Navy, et al.,<br><br>       Defendants. | Civil Action No. 73-0055 (PLF) |

OPINION

       The relevant facts and procedural history of this lengthy class action Title VII lawsuit have been set forth in many previous opinions, most recently by the United States Court of Appeals for the District of Columbia Circuit in Trout v. Sec'y of the Navy, 317 F.3d 286, 288-89 (D.C. Cir.), cert. denied, 540 U.S. 981 (2003).  To summarize briefly, the issue now before the Court for resolution is whether plaintiffs are entitled to prejudgment interest under Section 114(2) of the Civil Rights Act of 1991 on their award of backpay and attorneys' fees for periods prior to the effective date of the Act.  See 42 U.S.C. § 2000e-16(d).  On July 17, 2001, this Court entered a Final Judgment [666] awarding the plaintiffs $8,627,276.40 in interest on the backpay previously awarded, and $1,477,020.90 in interest on attorneys' fees.  The defendants appealed.

---

[1]     Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, Secretary Donald C. Winter has been substituted for former Secretary John H. Dalton.

On January 31, 2003, the court of appeals reversed, holding that the defendants could not be ordered to pay prejudgment interest on backpay and attorneys' fees for periods prior to November 21, 1991, when Section 114(2) of the Civil Rights Act became effective.  See Trout v. Sec'y of the Navy, 317 F.3d at 287-88, 290-91.  Furthermore, because defendants had paid interim attorneys' fees to counsel for plaintiffs that was attributable to litigation of the prejudgment interest issue -- the issue on which plaintiffs ultimately lost in the court of appeals -- the appellate court remanded to this Court for a "final determination of the costs and fees owed to the Trout class."  See id. at 293.  After remand, the defendants filed a Motion [673] for Final Determination of Attorneys' Fees and Costs Owed to the Plaintiff Class ("Mot. for Final Deter.") and plaintiffs filed a Motion [687] for Entry of Declaratory Judgment Awarding Plaintiffs' Pre-November, 1991 Interest on Backpay and Attorney's Fees Pursuant to Austria v. Altman [*sic*] ("Pl.'s Altmann Mot."), both of which are now before the Court.

## I.  BACKGROUND

Originally begun in 1973 as a Title VII class action employment discrimination lawsuit, the Trout litigation has now continued for over thirty years.  In 1981, after a lengthy trial involving forty-two witnesses, 7,000 pages of exhibits, and extensive regression analysis demonstrating sex discrimination in the Navy's hiring, promotion, evaluation and assignment of women, Judge Harold H. Greene, the presiding judge, found that the Navy had violated Title VII and ordered the award of backpay.  See Trout v. Hidalgo, 517 F. Supp. 873 (D.D.C. 1981); Trout v. Hidalgo, Civil No. 73-0055, 1981 WL 416 (D.D.C. Oct. 20, 1981).  See also Trout v. Lehman, 652 F. Supp. 144 ((D.D.C. 1986).  As recounted by the court of appeals, numerous additional

decisions and stipulations followed, awarding additional backpay.  See Trout v. Sec'y of the Navy, 317 F.3d at 288.  On September 20, 1993, the parties entered into a stipulation settling the case on its merits [553]; Judge Greene approved the stipulation on November 22, 1993 [569].  Because, as even defendants agree, plaintiffs were the prevailing parties in the Title VII case, Judge Greene properly also awarded attorneys' fees and costs to plaintiffs.  Id.

       While the case was pending on its merits, the Civil Rights Act of 1991 was enacted.  It provided in Section 114(2) for the award of prejudgment interest:  the federal government is liable for "the same interest to compensate for delay in payment [as is available] in cases against nonpublic parties."  42 U.S.C. § 2000e-16(d).  By stipulations of May 10, 1995 [596, 597], defendants agreed to pay prejudgment interest on the backpay and attorneys' fees awards, the interest to begin running from November 21, 1991, the effective date of the Civil Rights Act of 1991.  Plaintiffs preserved their right to seek interest for periods before that date.  See Stipulation [596] at 4; Stipulation [597] at 2-3.

       The issue presented first to Judge Greene and then to the court of appeals was whether Section 114(2), which became effective on November 21, 1991, could be applied where the discriminatory conduct had terminated before the effective date of the law.  Judge Greene, who handled the case for most of its lengthy history, concluded that even though the liability phase of this case had ended on April 25, 1990, the application of Section 114(2) was appropriate given the government's efforts "to delay the litigation and to drive up its costs."  See Trout v. O'Keefe, 144 F.R.D. 587, 590 (D.D.C. 1992).  On July 22, 1998 and August 12, 1998, respectively, Judge Greene issued a Memorandum Opinion and Orders awarding plaintiffs prejudgment interest on attorneys' fees [621] and on backpay awards [622].  Prior to the entry of

Final Judgment, however, Judge Greene passed away.  The case was randomly reassigned to the undersigned and, on July 17, 2001, this Court entered Final Judgment [666] and ordered the defendants to pay interest on the backpay awards and attorneys' fees.

This Court's July 17, 2001 Final Judgment with respect to prejudgment interest was based on two stipulations that had been approved by Judge Greene and an Order issued by the undersigned:

> 1.  By stipulation and order of March 3, 1999 [644], Judge Greene ordered the payment of $8715.00 to compensate plaintiffs for the expert services of John Chagnon.
>
> 2.  By stipulation and order of May 5, 1999 [646], Judge Greene ordered the payment of $76,097.45 to plaintiffs' attorneys for work performed between June 5, 1997 and January 20, 1999 litigating the pre-November 21, 1991 interest issue.
>
> 3.  By order of May 31, 2001, the undersigned ordered defendants to pay attorneys' fees to plaintiffs in the amount of $21,563 for work done by plaintiffs' counsel between January 30, 1999 and April 30, 2000 litigating the pre-November 21, 1991 interest issue.

In the March 3, 1999 and May 5, 1999 stipulations, defendants expressly reserved their right to seek recovery of the amounts agreed to and paid should they "ultimately obtain a judgment that they do not owe pre-November 21, 1991 interest on backpay and/or attorneys' fees."  See Stipulation [644] at 2; Stipulation [646] at 1-2.  Defendants' partial opposition to and partial concurrence in the motion leading to the May 31, 2001 Order contained a similar reservation. The total amount of attorneys' fees, expert fees and costs covered by the two stipulations and the Order described above is $106,375.45.

The defendants appealed the July 17, 2001 Final Judgment.  On January 31, 2003, the court of appeals reversed on the issue of pre-November 21, 1991 interest, holding that

Section 114(2) of the Civil Rights Act did not apply to a period before its effective date. The court of appeals remanded the case to this Court for a "final determination of the fees and costs owed to the Trout class." Trout v. Sec'y of the Navy, 317 F.3d. at 292-93.

In its opinion, the court of appeals emphasized two points. First, any statute waiving the sovereign immunity of the United States is subject to the rule of strict construction. See Trout v. Sec'y of the Navy, 317 F.3d at 289-90 (citing Library of Congress v. Shaw, 478 U.S. 310, 318 (1986) and Ruckelshaus v. Sierra Club, 463 U.S. 680, 685 (1983)). Any doubts about the scope of waiver are to be "resolved in favor of the narrower, governmental liability." Id. (quoting Nichols v. Pierce, 740 F.2d 1249, 1257 (D.C. Cir. 1984). Because there is no express language in Section 114 or in the legislative history of the Civil Rights Act of 1991 suggesting that Congress intended retroactively to waive immunity as to the government's liability for interest payments, the court explained that "to apply § 114(2) retroactively would be to impose liability on the government without its explicit, required consent." Trout v. Sec'y of the Navy, 317 F.3d at 290 (citing Brown v. Sec'y of the Army, 78 F.3d 645, 654 (D.C. Cir. 1996)).

Second, the court of appeals reasoned that the ongoing nature of the litigation at the time of the enactment of Section 114(2) and the fact that final judgment on remedy was not entered until after the statute's effective date were insufficient justifications for applying that provision to this case. The court emphasized that the relevant issue was not the procedural posture of the case and its ongoing nature, but rather whether the discriminatory *conduct* was ongoing at the time of the provision's passage. See Trout v. Sec'y of the Navy, 317 F.3d at 291. Since the Title VII violations at issue had ended in 1979, over a decade before the enactment of

Section 114(2), and the liability phase of the case was concluded by April 25, 1990, there was no basis for the award of pre-November 21, 1991 interest. See id. at 292. For these reasons, the court of appeals held that this Court had erred in awarding prejudgment interest on backpay and attorneys' fees for periods prior to November 21, 1991. See id. at 293. Since the Navy already had paid some interim attorneys' fees and costs to the plaintiffs, the court of appeals remanded the case for the proper determination of the fees and costs owed to the Trout class. See id. Plaintiffs filed a petition for rehearing and a suggestion of rehearing en banc, which were denied by the court of appeals on March 28, 2003. Plaintiffs also filed a petition for a writ of certiorari with the United States Supreme Court which was denied on November 10, 2003.

After this case was remanded, defendants filed their motion for a final determination of attorneys' fees and costs owed, seeking a refund of $106,375.45, plus interest. See Mot. for Final Deter. at 1. On December 22, 2003, plaintiffs filed an opposition. On December 17, 2003, plaintiffs also filed a separate motion to dismiss with prejudice defendants' claim for recoupment of $106,375 [676]. That motion was administratively closed, but the arguments therein have been treated as further opposition to the motion for a final determination. See Order of September 30, 2004 [684].

In the interim, the Supreme Court issued a decision in Austria v. Altmann, 541 U.S. 677 (2004), which plaintiffs contend was an intervening and controlling decision. Plaintiffs filed with the Supreme Court a petition for rehearing of the denial of their petition for a writ of certiorari. See October 5, 2004 Notice [685]. That petition was denied on November 1, 2004. See November 5, 2004 Notice [686]. Plaintiffs then filed a motion [687] with this Court for

entry of judgment awarding plaintiffs pre-November, 1991 interest on backpay and attorneys' fees pursuant to Austria v. Altmann, which also is before the Court.

## II.  ATTORNEYS' FEES AND COSTS

The funds the defendants seek to recover include the interim attorneys' fees and costs paid to the plaintiffs after 1997 that relate exclusively to the time spent and costs incurred in connection with litigating the issue of the right to prejudgment interest for the period prior to the enactment of the Civil Rights Act of 1991, plus interest thereon.  The relevant question here is whether the plaintiffs are entitled to attorneys' fees and costs as the "prevailing party" for that time period because of their success in the underlying Title VII litigation or, as defendants argue, whether the plaintiffs' failure with respect to the prejudgment interest dispute precludes "prevailing party" status *as to that claim* and therefore precludes the award of fees and costs regarding that claim.

Under the Supreme Court's decision in Hensley v. Eckerhart, 461 U.S. 424, 434-35 (1983), a party's entitlement to attorneys' fees must be premised on successful litigation of a claim.  "In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories.  In such a suit, even where the claims are brought against the same defendants . . . counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved." Hensley v. Eckerhart, 461 U.S. at 434-35.  In light of Hensley, our court of appeals has noted that a plaintiff "may recover fees only for work related to the claim on which he prevailed." Williams v. First Government Mortgage &

Investors Corp., 225 F.3d 738, 746 (D.C. Cir. 2000) (citing Hensley v. Eckerhart, 461 U.S. at 434); see also Anthony v. Sullivan, 982 F.2d 586, 589 (D.C. Cir. 1993) ("[W]hen a party has obtained no favorable results in a particular aspect of a litigation, that party may receive no fee for work on that part of the case.").

The defendants argue that the prejudgment interest claim that plaintiffs unsuccessfully litigated was discrete from their successful litigation of the Title VII claim and that plaintiffs therefore are not entitled to attorneys' fees and costs on that issue.  See Memorandum of Points and Authorities in Support of Mot. Final Deter. at 10-11.  The defendants note that the Final Order regarding backpay was signed on November 22, 1993 and that the prejudgment interest claim continued to be litigated for years after the Title VII litigation had terminated.  See id. at 7.  The defendants also note that the parties stipulated on July 9, 1997 that the "only remaining issue before the Court is the award of interest on attorneys' fees and costs."  Id. at 3.  Defendants argue that the prejudgment interest litigation therefore is a separate claim, distinguishable from the earlier litigation.  See id. at 8-10.  Since plaintiffs ultimately were unsuccessful on that claim, defendants contend that plaintiffs are not entitled to attorneys' fees and costs as a "prevailing party" on that claim.  See id. at 9.

*A. Judgment Fund*

While the plaintiffs do not dispute their ultimate lack of success on the prejudgment interest issue, they make several arguments as to why the defendants' motion nevertheless should be denied.  Plaintiffs' primary argument is that a refund is precluded because the payments were financed by the government's judgment fund.  See Plaintiffs' Opposition to

Defendants' Motion for Final Determination ("Opp.") at 2.  Under 31 U.S.C. § 1304, Congress created the "judgment fund" statute to allocate "[n]ecessary amounts" to be "appropriated to pay *final judgments*, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law."  31 U.S.C. § 1304(a) (emphasis added).  Under the statute, payment is only provided when a judgment is final under 28 U.S. C. § 2414.[2]  Plaintiffs argue that the explicit language of 28 U.S.C. § 2414 regarding "final judgments" indicates that any payment made through the judgment fund is precluded from further appeals.  See Opp. at 2. Alternatively, plaintiffs maintain that even if the payments are subject to appeal, the defendants should have appealed at the time of each of the interim payments rather than at the conclusion of the litigation because each payment -- made, as it was, from the judgment fund -- necessarily was final.  See id.

      Ironically, this line of argument was last discussed by the court of appeals in Trout v. Garrett, 891 F.2d 332 (D.C. Cir. 1989), an appeal from an earlier decision by Judge Greene in this very case.  At that point in the litigation, it was the government that argued that it was unable to make interim payments through the judgment fund because the express language of the fund only allowed for payment of "final" judgments.  The court of appeals disagreed, noting that under 42 U.S.C. § 2000e-5(k) Congress expressly waived the immunity of the United States from claims, whether final or interim, for attorneys' fees and costs.  See id. at 333.  The court of appeals reasoned that if Congress expressly allowed a claim for interim fees against the

---

[2]    28 U.S.C. § 2414 provides, in part, that "payment of *final judgments* rendered by a district court . . . against the United States shall be made on settlements by the Secretary of the Treasury," and that "[w]henever the Attorney General determines that no appeal shall be taken from a judgment or that *no further review will be sought* from a decision affirming the same, he shall so certify and the judgment shall be deemed final." (emphasis added).

government by a Title VII plaintiff, then it must also have intended that there be some means by which to pay the interim fees and costs. See id. at 334. The court explained that "to acknowledge an interim fee as *awardable* against the government but not *payable* prior to a [final] judgment . . . 'makes nonsense of the concept of an *interim* award.'" Id. (quoting Rosenfeld v. U.S., 859 F.2d 717, 727 (9th Cir. 1988)) (emphasis in originals). The court continued: "We find no tenable support for the notion that Congress designed the judgment fund measure to retract or limit duly enacted waivers of sovereign immunity, and we do not doubt the government's ability to arrange for payment of its lawfully-declared debts." Id. at 335. The court went on to state that once it is understood that sovereign immunity does not preclude the payment of "interim" fee awards, it was apparent that the district court's order was not immediately reviewable. Id. The court also noted that "[i]nterlocutory is indeed the word descriptive of the district court's fee award. The award does not even dispositively determine fees . . ." Id. Interim payments, because they were neither final nor dispositive, could not be immediately appealed. Id. at 333.

      While the Trout class may now want to suggest that each of the payments through the "judgment fund" was final and that the time to appeal each has passed, the court of appeals' decision in Trout v. Garrett rejected this line of reasoning. See Trout v. Garrett, 891 F.3d at 335. The D.C. Circuit dismissed the appeal, expressly requiring that the government wait to appeal until after a final decision was rendered; nothing about the means of payment through the judgment fund prevents a later appeal. Id. Finally, as defendants note, in this case stipulations were entered into by the parties at the time of two of the three interim payments that defendants retained the "right to seek recovery" in the event that they ultimately obtained a decision that they

did not owe pre-November 21, 1991 interest.  See Memorandum of Points and Authorities in Support of Mot. for Final Deter. at 5.  As a result, neither payment through the "judgment fund" nor the government's failure to immediately appeal therefrom precludes the instant request for a refund.

*B.  Relatedness of Claims*

The next question before the Court is whether the plaintiffs' previous successful litigation of the Title VII claim is sufficiently related to the unsuccessful prejudgment interest dispute that attorneys' fees and costs should be granted for litigation of the latter.  In Hensley v. Eckerhart, the Supreme Court acknowledged that "there is no certain method of determining when claims are related or unrelated."  Hensley v. Eckerhart, 461 U.S. at 437 n. 12 (internal quotations and citations omitted). The Court also emphasized that it was within the district court's discretion to consider factors, like "the extent of a plaintiff's success" and "the scope of the litigation as a whole" in making the relatedness determination.  Id. at 438-39.  While the district court clearly has such discretion in calculating an appropriate fee, our court of appeals has held that under Hensley "when a party has received no favorable results in a particular aspect of a litigation, that party may receive no fee for work on the part of the case."  Anthony v. Sullivan, 982 F.2d at 589.  "*[N]o* fee may be granted for work done on claims on which the party did not prevail, unless the unsuccessful claims were submitted as alternative grounds for a successful outcome that the plaintiff did actually achieve."  Id. (emphasis in original).  See also Williams v. First Government Mortgage & Investors Corp., 225 F.3d. at 746 (holding that party may recover fees only for work related to the claim on which he prevailed).

Applying the principles enunciated by the courts in Hensley, Anthony and Williams, this Court concludes that plaintiffs' unsuccessful claim for pre-November 21, 1991 prejudgment interest was distinct from their successful Title VII litigation. The court of appeals rejected plaintiffs' claim for such interest and reversed Judge Greene's decision awarding such interest payments. Thus, plaintiffs did not prevail on this discrete claim, which was neither an alternative ground for a successful outcome nor integral to the larger Title VII litigation. Attorneys' fees and costs therefore may not be awarded to plaintiffs with respect to that claim.

*C. Scope of Remand*

Plaintiffs' only remaining argument against the refund concerns the precise scope of the remand from the court of appeals. Plaintiffs argue that the court of appeals remanded for a "final determination of the costs and fees owed *to the Trout class*" and not for the purpose of determining the costs and fees owed *to the Navy*. See Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Dismiss with Prejudice Defendants' Claim for Recoupment [676] at 2 (emphasis added). The Court disagrees. The Court is not awarding the Navy *its* costs and fees, of course – the Court is issuing a final determination of the costs and fees actually owed to the Trout class. Following the decision of the court of appeals, the Court concludes that the Trout class is not owed certain of the specific costs and fees which defendants already paid on an interim basis. Plaintiffs therefore must return those interim payments to defendants.

III.  EXPERT FEES

Plaintiffs' expert, John Chagnon, is a certified public accountant hired by plaintiffs for the sole purpose of determining the proper amount of pre-November 21, 1991

interest owed to the Trout class under Judge Greene's orders. Congress included expert costs as a part of an award of a prevailing party's attorneys' fees. See 42 U.S.C. § 1988(c).[3] Because expert costs are awarded as a part of attorneys' fees, it follows that a refund of related expert fees awarded will accompany a refund of any attorneys' fees awarded. By stipulation and order of March 3, 1999 [644], defendants agreed to pay for Mr. Chagnon's services in the amount of $8715, but they reserved their right to seek the recovery of this amount if it were ultimately determined that they did not owe pre-November 21, 1991 interest on backpay or attorneys' fees – the amount that Mr. Chagnon was hired to calculate. See March 3, 1999 Stipulation [644] at 2. Since Mr. Chagnon was hired and used for the exclusive purpose of helping plaintiffs pursue this unsuccessful claim, see Reply [678] at 14, the payments for his services therefore must be included in the refund.

## IV.  THE IMPACT OF AUSTRIA V. ALTMANN

Following the court of appeals' reversal and remand, the Supreme Court decided Austria v. Altmann, 541 U.S. 677 (2004). Plaintiffs argue that the decision in Altmann was an "intervening and controlling decision" that should render the court of appeals' decision in this case moot. See Pl.'s Altmann Mot. at 4, 7, 12. According to plaintiffs, the decision in Altmann alters the "default rule" against retroactivity announced in Landgraf v. USI Film Products, 511 U.S. 244 (1994). They argue that Landgraf "does not apply to statutory waivers of sovereign immunity." Pl.'s Altmann Mot. at 7. Defendants respond that this Court has no power

---

[3]  42 U.S.C. § 1988(c) provides: "In awarding an attorney's fee under subsection (b) of this section in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee."

to (1) expand the scope of the remand from the court of appeals, (2) disregard the Supreme Court's denial of *certiorari* to hear the Trout case, or (3) effectively reverse the court of appeals' judgment in this case.  See Defendants' Opposition to Plaintiff's Motion for Entry of Judgment at 2.  Further, defendants emphasize that nothing in the Altmann decision affects the remand because Landgraf is still the law and the court of appeals properly applied it in this case.  See id. at 5.

        The Court agrees with defendants' final argument and concludes that the decision in Altmann does not affect the present remand.  The decision in Austria v. Altmann did not alter the rule set forth in Landgraf that absent a clear congressional intent to the contrary, statutes do not operate retroactively.  See Landgraf v. USI Film Products, 511 U.S. at 280.  On the contrary, the Supreme Court in Altmann stated that the decision in Landgraf did "not provide a clear answer *in this case*."  Austria v. Altmann, 541 U.S. at 694 (emphasis added).  In significant part, the Supreme Court's decision in Altmann hinged on the substantial differences between statutes such as Title VII, which Landgraf involved, and the sovereign immunity of foreign states, the issue involved in Altmann.  See id. at 696.  In examining the language in the preamble to the Foreign Sovereign Immunities Act ("FSIA"), the Supreme Court discussed the ambiguity surrounding whether the statute might be intended to be retroactive.  The Court emphasized the words of the preamble:  "*[c]laims* of foreign states to immunity should *henceforth* be decided by courts . . ."  Austria v. Altmann, 541 U.S. at 697 (quoting 28 U.S.C. § 1602).  Throughout its opinion, the Supreme Court reiterated that its holding was a narrow one, applicable specifically to the FSIA.  See 541 U.S. at 700.  As a result of the narrowness of the holding in Altmann and the significant distinctions between the facts of Altmann and those of the present case -- also,

like Landgraf, a Title VII case involving the 1991 amendments to the Civil Rights Act -- it is evident that the decision in Altmann is not an intervening change in controlling law that affects the court of appeals' reversal and remand in this case.

V.  INTEREST ISSUE

One final issue remains: whether the refund to the Navy should include interest, and if such interest is granted, at what rate.  Defendants note that the Trout class and its counsel have had the use of the attorneys' fees and expert costs for many years.  See Memorandum of Points and Authorities in Support of Mot. for Final Deter. at 13.  Defendants argue that in order to restore the parties to the status quo, the government is entitled to interest on the refund.  Id. The Court agrees.

This Court's initial Memorandum Opinion and Order granting prejudgment interest to the Trout class ordered defendants to pay interest at the prime rate rather than at the more favorable Treasury Bill rate, as defendants had urged.  See Memorandum Opinion and Order issued May 31, 2001 [659].  While the fairest result now would be to require plaintiffs in making their refund to defendants to pay interest at the same prime rate they received, the government continues to believe that the Treasury Bill rate is more appropriate for such calculations and consistent with precedents involving prejudgment interest calculations in other contexts.  See Memorandum of Points and Authorities in Support of Mot. for Final Deter. at 13-14.  It therefore proposes that the rates and procedures specified in 28 U.S.C. § 1961 be adopted to calculate interest with respect to the excess interim payments, even though this approach provides a financial windfall to the plaintiffs.  The Court adopts defendants' suggestion.

A separate Order consistent with this Opinion will issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: December 15, 2006